# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Submitted April 24, 2007          Decided June 26, 2007

No. 05-1419

OHNGO GAUDADEH DEVIA,
PETITIONER

v.

NUCLEAR REGULATORY COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

PRIVATE FUEL STORAGE, L.L.C. AND
SKULL VALLEY BAND OF GOSHUTE INDIANS,
INTERVENORS

———

Consolidated with
05-1420, 06-1087

———

On Petitions for Review of Orders and a License of the
Nuclear Regulatory Commission

———

*Paul C. EchoHawk* was on the briefs for petitioner Ohngo
Gaudadeh Devia.

*Roy T. Englert, Jr.* was on the briefs for petitioner State of
Utah.

*Catherine Cortez Masto*, Attorney General, *Marta A. Adams*, Senior Deputy Attorney General, and *Martin G. Malsch*, *Joseph R. Egan*, and *Charles J. Fitzpatrick* were on the brief for *amicus curiae* State of Nevada in support of petitioners.

*James C. Kilbourne*, *Michael T. Gray*, and *Lisa E. Jones*, Attorneys, U.S. Department of Justice, and *Karen D. Cyr*, General Counsel, *John F. Cordes, Jr.*, Solicitor, *E. Leo Slaggie*, Deputy Solicitor, and *Grace H. Kim*, Attorney, U.S. Nuclear Regulatory Commission, were on the brief for federal respondents.

*Anne W. Cottingham* and *Michael A. Bauser* were on the brief for *amicus curiae* Nuclear Energy Institute, Inc. in support of respondents.

*Tim Vollmann*, *Jay E. Silberg, Paul A. Gaukler* were on the brief for intervenors Private Fuel Storage, L.L.C. and Skull Valley Band of Goshute Indians.

Before: ROGERS, TATEL, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Petitioners challenge a decision by the Nuclear Regulatory Commission to grant a license permitting the construction and operation of a spent nuclear fuel storage facility in Utah, on land belonging to the Skull Valley Band of Goshute Indians. After the Commission approved the license, the Interior Department's Bureau of Land Management and Bureau of Indian Affairs denied applications for rights-of-way and a lease, respectively. Because it is speculative whether

the project will ever be able to proceed, we find the petitioners' challenge unripe and direct that the case be held in abeyance.[1]

I

In 1997, Private Fuel Storage, L.L.C. (PFS), a consortium of eight nuclear utilities, applied to the Nuclear Regulatory Commission (NRC) for a license to build and operate an Independent Spent Fuel Storage Installation (ISFSI). The proposed ISFSI would store spent nuclear fuel in steel and concrete casks on land in Utah belonging to the Skull Valley Band of Goshute Indians. The facility would be built on an 820-acre site, about 3.5 miles from the Band's village, pursuant to a lease between the Band and PFS. While most ISFSIs are located at the reactors where the spent nuclear fuel is generated, PFS's proposed ISFSI would be the first large, away from point-of-generation repository to be licensed by the NRC.

In addition to applying to the NRC for a license, PFS sought two other regulatory approvals. First, it applied to the Bureau of Indian Affairs (BIA) for approval of the Skull Valley Band's lease of the 820-acre site to PFS. Second, it applied to the Bureau of Land Management (BLM) for a right-of-way to transport the spent nuclear fuel from the main Union Pacific rail line to the ISFSI. PFS proposed two right-of-way options. Its preferred option was to build a new, 32-mile rail spur from the main line that would run along the base of the Cedar Mountains to the ISFSI. PFS's alternative option was to build an intermodal transfer facility, at which spent nuclear fuel would be

---

[1]These petitions for review were considered on the record from the Nuclear Regulatory Commission and on the briefs filed by the parties. *See* FED. R. APP. P. 34(a)(2); D.C. CIR. R. 34(j).

transferred from railcars to heavy-haul vehicles and then transported to the ISFSI via Skull Valley Road, a two-lane public road.

On September 9, 2005, following a lengthy administrative proceeding in which the petitioners participated, the NRC issued a memorandum and order authorizing its staff to issue a license to PFS to build and operate the ISFSI. On February 21, 2006, after denying Utah's motion to reopen the record, NRC granted the license. The license, which is specific to the site designated in the proposed lease, permits PFS to store up to 40,000 metric tons of spent nuclear fuel at the facility. Its term is twenty years, with an option to renew for another twenty.

Petitioner Ohngo Gaudadeh Devia (OGD) -- an association consisting primarily of members of the Skull Valley Band opposed to construction of a nuclear waste facility on the reservation -- timely petitioned for review of the NRC's decision in this court. So, too, did the State of Utah. PFS and the Skull Valley Band intervened on the side of the NRC.

Subsequent to the filing of the petitions for review, the BLM and the BIA denied the applications that PFS had filed with each agency. The BLM disapproved both of PFS's requested rights-of-way: the preferred rail route, and the alternative intermodal transfer facility route. The Bureau rejected the rail line request on the ground that the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136 (2006), which had been signed into law after publication of the project's final environmental impact statement, "clearly required" denial. BLM, Record of Decision at 10 (Sept. 7, 2006). Section 384 of the Act designated certain lands, including those described in PFS's right-of-way application, as wilderness and added them to the National Wilderness Preservation System. *See* National Defense

Authorization Act § 384, 119 Stat. at 3217-18; BLM, Record of Decision at 8. "[O]peration of a rail line," the BLM said, "would be inconsistent with the purpose for which the BLM manages the Cedar Mountain Wilderness Area." BLM, Record of Decision at 10. The BLM also rejected the alternative option, on the ground that the intermodal transfer facility was "contrary to the public interest." *Id.* In the BLM's view, "too many questions remain unanswered" regarding the potential risk and impact of transporting spent nuclear fuel along Skull Valley Road. *Id.*; *see id.* at 10-15.

For its part, the BIA rejected the Skull Valley Band's lease of reservation land to PFS for the construction and operation of the ISFSI. Although the local BIA superintendent had conditionally approved the lease in May 1997, the Bureau declared itself unconstrained by the superintendent's conditional approval. The Bureau based its disapproval on a variety of concerns, including the adequacy of the environmental impact analysis, the relationship of the use of leased lands to neighboring lands, the lack of specialized resources with which to monitor the tenant's activities and enforce the lease, and the inability to ascertain when spent nuclear fuel might leave the land. *See* BIA, Record of Decision at 18-29 (Sept. 7, 2006).

The parties advised us of these post-petition developments in their briefs on the merits. We requested supplemental briefing regarding the impact of these developments on justiciability, and we now conclude that the petitions are not ripe for review and should be held in abeyance.

II

The Supreme Court has noted that "[r]ipeness is a justiciability doctrine" that is "'drawn both from Article III limitations on judicial power and from prudential reasons for

refusing to exercise jurisdiction.'" *National Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 57 n.18 (1993)). Even in a case "raising only prudential concerns, the question of ripeness may be considered on a court's own motion." *Id*. at 808. We do so here.

"In testing whether the facts of a particular case meet th[e] standard of ripeness, we have often applied a two-part analysis, evaluating '[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration.'" *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). The "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs.*, 387 U.S. at 148-49. But as we have also explained, the "usually unspoken element of the rationale" is this: "If we do not decide [the claim] now, we may never need to. Not only does this rationale protect the expenditure of judicial resources, but it comports with our theoretical role as the governmental branch of last resort. Article III courts should not make decisions unless they have to." *National Treasury Employees Union*, 101 F.3d at 1431 (citation omitted); *see McInnis-Misenor v. Maine Medical Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (Boudin, J.) (noting that, "[i]n the fitness inquiry, . . . prudential concerns focus[] on the policy of judicial restraint from unnecessary decisions").

7

A

"Among other things, the fitness of an issue for judicial decision depends on whether it is 'purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Atlantic States Legal Found., Inc. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (quoting *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998)). But when an agency decision may never have "its effects felt in a concrete way by the challenging parties," *Abbott Labs.*, 387 U.S. at 148-49, the prospect of entangling ourselves in a challenge to such a decision is an element of the fitness determination as well. *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 162-63 (1967) (holding that, even though a regulation was "the agency's considered and formalized determination," and the issue "present[ed] a purely legal question," the lawfulness of the action authorized by the regulation was not fit for judicial resolution, because (inter alia) it was uncertain "whether or when" the authority would be used). As the First Circuit has put it:

> Even though the legal issues may be clear, a case may still not be fit for review: [T]he question of fitness does not pivot solely on whether a court is capable of resolving a claim intelligently, but also involves an assessment of whether it is appropriate for the court to undertake the task. Federal courts cannot -- and should not -- spend their scarce resources on what amounts to shadow boxing. Thus, if a plaintiff's claim, though predominantly legal in character, depends on future events that may never come to pass, or that may not occur in the form forecasted, then the claim is unripe.

*McInnis-Misenor*, 319 F.3d at 72 (internal quotation marks omitted); *see W.R. Grace & Co. v. EPA*, 959 F.2d 360, 366 (1st Cir. 1992) ("[P]remature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues unnecessarily, wasting time and effort." (internal quotation marks omitted)). Hence, a "claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 471 U.S. 568, 580-81 (1985)); *see Suburban Trails, Inc. v. New Jersey Transit Corp.*, 800 F.2d 361, 367 (3d Cir. 1986) ("'Agency action may be found not ripe for review because the need will not arise until some action is taken by third parties who are not involved in the review proceeding.'" (quoting 13A CHARLES A. WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3532.6 (1984))).

Resolution of the petitioners' challenge to the licensing of the storage facility at issue here has all the earmarks of a decision that "we may never need to" make. *National Treasury Employees Union*, 101 F.3d at 1431. The denials of approval by the BLM and BIA appear to block the activity -- construction and operation of the facility -- that petitioners OGD and Utah contend will concretely affect them. The intervenors -- PFS and the Skull Valley Band -- say that they are "planning to challenge" the BLM and BIA denials in court. Intervenors' Supp. Br. 4. But they have not filed a challenge yet, and they claim to have six years in which to do so. *See id.* (citing 28 U.S.C. § 2401(a)). Of course, even if the intervenors do seek review, the ultimate result "may not occur as [they] anticipate[]." *Texas*, 523 U.S. at 300 (internal quotation omitted). As the NRC concedes, "it is certainly possible that reversals of the BIA and BLM decisions 'may not occur at all.'"

NRC Supp. Br. 5 (quoting *Worth v. Jackson*, 451 F.3d 854, 861 (D.C. Cir. 2006) (quoting *Texas*, 523 U.S. at 300)).

The intervenors also insist that "reversal of [the BLM] decision is not required for the project to go forward." Intervenors' Supp. Reply Br. 3 n.5. "That decision," they argue, "only concerned two transportation options, and . . . NRC regulations governing the transportation of spent nuclear fuel would not preclude PFS from accomplishing an intermodal transfer at locations for which no Bureau of Land Management . . . approval would be required." *Id.* Even if that is true, PFS has not proposed any such option, nor even described one in its briefs. The BLM rejected the only options that PFS did propose, both of which require BLM approval. In the absence of an actual proposal from PFS for an alternative intermodal transfer location, it is impossible to know whether or what kind of administrative approval would be required. Such a speculative possibility cannot render the instant petitions ripe for adjudication.

In any event, even if PFS were to find a way to accomplish an intermodal transfer that does not require BLM approval, the BIA's disapproval of the lease would still block construction and operation of the facility. The license granted by the NRC is site-specific, authorizing storage only at the location designated in the proposed lease and rejected by the BIA. *See* License for Independent Storage of Spent Nuclear Fuel ¶ 10 (J.A. 1992). Indeed, even the intervenors concede that PFS cannot construct or operate the facility without BIA approval -- or judicial reversal of its disapproval. Intervenors' Supp. Br. 7. The chances of either result, at least at this point, are simply unknown. Put another way, we "find it too speculative whether" the validity of the NRC license is a problem that "will ever need solving." *Texas*, 523 U.S. at 302.

In sum, the institutional interests in deferring review here are high.  Those include avoiding, until the impact on the parties is more certain, the expenditure of judicial resources on a complex, fact-intensive case with a joint appendix of over 4000 pages.  But they also include avoiding the issuance of what could effectively become an advisory opinion: if the BIA's decision is upheld on review (or review is not sought), any opinion regarding the validity of the NRC's site-specific license could well be moot.

Neither petitioners Utah and OGD, nor respondent NRC, disputes that we have discretion to defer review as a prudential matter.  Nor do they object to our holding the case in abeyance -- as compared to dismissing the petitions -- pending PFS's securing the administrative approval (by judicial reversal of disapproval or otherwise) required for it to construct and operate the storage facility.  That is what we did under analogous circumstances in *Town of Stratford v. FAA*, 285 F.3d 84 (D.C. Cir. 2002), *reh'g denied*, 292 F.3d 251 (D.C. Cir. 2002).  In that case, the town petitioned for review of a Federal Aviation Administration (FAA) plan to renovate runways at a local airport.  *Id*. at 86.  When the case was argued, we learned that part of the property necessary to implement the FAA's plan was under the Army's control and that the Army had not yet decided to give up the land.  *See Town of Stratford,* 292 F.3d at 252.  Because "considerations of prudential ripeness suggested that we withhold our decision and opinion unless and until the Army finally decided to release its portion of the property to be used for the airport improvement," we held the case in abeyance pending "such an occurrence."  *Id*.; *see id.* (noting that "our ripeness concern was a prudential one -- we did not wish to devote judicial resources when it might not be necessary").[2]

---

[2]*See also Blumenthal v. FERC*, Nos. 03-1066, 03-1075, 2003 WL 21803316, at *1 (D.C. Cir. July 31, 2003) (holding a challenge to

Like the FAA's airport plan, progress on PFS's spent fuel storage facility awaits uncertain approvals from other agencies, including the agency (BIA) that effectively controls the relevant property. Indeed, this case presents a stronger warrant for abeyance, as those agencies have *already* denied the necessary approvals.

B

In deciding whether to find this case prudentially unripe and to hold it in abeyance, we must also consider "'the hardship to the parties of withholding court consideration.'" *National Treasury Employees Union*, 101 F.3d at 1431 (quoting *Abbott Labs.*, 387 U.S. at 149). Neither petitioner suggests that it would suffer any hardship were we to hold its petition in abeyance. Nor does the respondent, the NRC. However, PFS and the Skull Valley Band, which intervened on the side of the NRC, assert that *they* would suffer hardship from such a disposition. Although courts have described this factor as hardship to "the parties," and intervenors have party status, they cite no case in which a court actually considered the hardship to

---

FERC's approval of a pipeline in abeyance, pending the resolution of an administrative challenge to Connecticut's rejection of a required certification); *cf. Atlantic States Legal Found., Inc.*, 325 F.3d at 284-85 (finding unfit for judicial decision a challenge to EPA regulations allowing utilities to accumulate hazardous waste because, before the regulations could have any effect, a state agency would have to adopt them, and "[n]o one can say with certainty that" the agency would); *Friends of Marolt Park v. Dep't of Transp.*, 382 F.3d 1088, 1094 (10th Cir. 2004) (holding that a challenge to the Department of Transportation's authorization of a construction project was unripe, because "before the project [could] go forward further action by local voters [was] required"); *Suburban Trails*, 800 F.2d at 365-67 (finding a challenge to a state agency's action unripe for review, because it was effectively subject to veto by a federal agency).

a respondent (or an intervenor-respondent) of deferring a decision on a challenger's petition. *Cf. National Park Hospitality Ass'n*, 538 U.S. at 808 (noting that the ripeness doctrine is designed in part to defer decision until an administrative decision's "'effects [are] felt in a concrete way *by the challenging parties*'" (emphasis added) (quoting *Abbott Labs.*, 387 U.S. at 148-49)); *Toilet Goods Ass'n*, 387 U.S. at 164 (describing the hardship factor as relating to "the degree and nature of the regulation's present effect *on those seeking relief*" (emphasis added)).

In any event, we find the intervenors' claim of hardship insubstantial. They are "'not required to engage in, or to refrain from, any conduct'" during the time the case is held in abeyance. *Atlantic States Legal Found., Inc.*, 325 F.3d at 285 (quoting *Texas*, 523 U.S. at 301). To the contrary, because the NRC granted the license, and because a decision to hold the petitions in abeyance would not invalidate it, each intervenor would remain "free to conduct its business as it sees fit." *National Park Hospitality Ass'n*, 538 U.S. at 810. Nonetheless, PFS and the Band contend that, if we do not review the case now, they will suffer hardship because "[u]nresolved judicial challenges, such as the pending challenge to the NRC license, necessarily increase the uncertainty as to the viability of the PFS project and make it more difficult to market the project." Intervenors' Supp. Reply Br. 3. But any uncertainty left by our decision to defer the challenge to the NRC's *approval* is surely dwarfed by the uncertainty brought about by the BIA and BLM *disapprovals*. And yet we cannot help but notice that the latter uncertainty has still not moved the intervenors to seek review of those disapprovals.

Moreover, the gravamen of the intervenors' argument "appears to be that mere uncertainty as to the validity of a legal rul[ing] constitutes a hardship for purposes of the ripeness

analysis." *National Park Hospitality Ass'n*, 538 U.S. at 811. As the Supreme Court said of such an argument in *National Park*: "We are not persuaded. If we were to follow [that] logic, courts would soon be overwhelmed with requests for what essentially would be advisory opinions because most business transactions could be priced more accurately if even a small portion of existing legal uncertainties were resolved." *Id.* Accordingly, we find that the intervenors here have "failed to demonstrate that deferring judicial review will result in real hardship." *Id*.

"In order to outweigh institutional interests in the deferral of review, the hardship to those affected by the agency's action must be immediate and significant." *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 940 (D.C. Cir. 1986); *see NRDC v. Thomas*, 845 F.2d 1088, 1093 (D.C. Cir. 1988). The hardship asserted by the intervenors is neither.

## III

For the foregoing reasons, we find the petitions for review unripe, and will hold this case in abeyance in accordance with the terms set forth in the accompanying order.

*So ordered.*