# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 11, 2007      Decided February 19, 2008

No. 06-1165

AMERICAN BIRD CONSERVANCY, INC.
AND FOREST CONSERVATION COUNCIL,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION,
RESPONDENT

CTIA - THE WIRELESS ASSOCIATION, ET AL.,
INTERVENORS

---

Petition for Review of an Order of the
Federal Communications Commission

---

*Jennifer C. Chavez* argued the cause for petitioner. With her on the briefs was *Stephen E. Roady*.

*Daniel M. Armstrong*, Associate General Counsel, Federal Communications Commission, argued the cause for respondent. With him on the brief were *Andrew C. Mergen* and *Jennifer L. Scheller*, Attorneys, U.S. Department of Justice, *Samuel L. Feder*, General Counsel, Federal Communications Commission, *Joseph R. Palmore*, Acting Deputy General Counsel, and *Laurel R. Bergold*, Counsel.

*Michael F. Altschul*, *Gary L. Phillips*, *Michael P. Goggin*, *M. Robert Sutherland*, *Ian H. Gershengorn*, *Elaine J. Goldenberg*, *Jane E. Mago*, *Jerianne Timmerman*, *Ann West Bobeck*, *Michael T. Fitch*, *L Andrew Tollin*, and *Craig E. Gilmore* were on the brief for intervenors in support of respondents.

Before: ROGERS, GARLAND and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

PER CURIAM: The American Bird Conservancy and Forest Conservation Council petition for review of an order by the Commission denying in part and dismissing in part their petition seeking protection of migratory birds from collisions with communications towers in the Gulf Coast region. *In Re Petition by Forest Conservation Council, American Bird Conservancy and Friends of the Earth for National Environmental Policy Act Compliance* ("*Order*"), 21 F.C.C.R. 4462 (2006). Their petition claimed that Commission rules and procedures for approving new towers failed to comport with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 701 *et seq.* We vacate the *Order* because the Commission failed to apply the proper NEPA standard, to provide a reasoned explanation on consultation under the ESA, and to provide meaningful notice of pending tower applications.

**I.**

Concerned about the effect of "tower kill" on migratory birds in the Gulf Coast region of the United States, Petitioners, on August 26, 2002, formally requested that the Commission, among other things, (i) prepare an environmental impact statement ("EIS") under NEPA analyzing the effects of all past, present, and reasonably foreseeable tower registrations on migratory birds in the Gulf Coast region; (ii) initiate formal consultation with the United States Fish and Wildlife Service ("FWS") pursuant to the ESA regarding the Gulf Coast towers' impact on various bird species; and (iii) take steps in accordance with the MBTA to reduce bird mortality at Gulf Coast tower sites. Petitioners also requested that they be provided notice of and an opportunity to comment on proposed Gulf Coast tower registration applications before they are granted.

While the Gulf Coast petition was pending, the Commission commenced a nationwide proceeding in a new docket. On August 20, 2003, it issued a Notice of Inquiry to gather evidence regarding communications towers' impact on migratory birds throughout the United States, and to determine whether to change its current rules and processes to better protect migratory birds. *See In re Effects of Communications Towers on Migratory Birds*, Notice of Inquiry, 18 F.C.C.R. 16,938, 16,938 ¶ 1 (2003). In response, the Commission received more than 250 comments expressing divergent views on the law and the facts, including the frequency of fatal collisions and the overall effect on migratory bird populations. Environmental groups claimed that towers kill 4 million to 50 million birds per year, *see, e.g.,* American Bird Conservancy Comments at 2, WT Docket No. 03-187 (Nov. 11, 2003), while industry groups claimed that such claims are overstated, *see*, *e.g.*, Cellular Telecommunications & Internet Association and National

Association of Broadcasters Comments at 9, WT Docket No. 03-187 (Nov. 12, 2003).

In April 2005, seeking to compel the Commission to act on the Gulf Coast petition, Petitioners filed a petition for a writ of mandamus in this court. Five days after oral argument, the Commission issued the *Order* denying in part, dismissing in part, and deferring in part the Gulf Coast petition. 21 F.C.C.R. 4,462. In dismissing the Gulf Coast petition, the Commission stated that it would address aspects of the migratory bird issue as part of a separate docket examining the issue on a nationwide basis. *Order*, 21 F.C.C.R. at 4463 ¶ 1. The court thereafter dismissed the mandamus case as moot. *See In re Am. Bird Conservancy, Inc.*, D.C. Cir. Docket No. 05-1112 (Apr. 19, 2006).

In November 2006, the Commission issued a notice of proposed rulemaking in the nationwide proceeding in which it sought further comment on the factual, legal, and policy issues regarding the impact of communications towers on migratory birds. *In re Effects of Communications Towers on Migratory Birds*, Notice of Proposed Rulemaking ("*NPRM*"), 21 F.C.C.R. 13,241 (2006). The Commission asked generally whether the impact warrants Commission action under the environmental statutes, *id.* at 13,242 ¶ 1, and expressed uncertainty about the underlying facts, seeking "further comment supported by evidence regarding the number of migratory birds killed annually by communications towers," *id.* at 13,259 ¶ 36. It also sought comments on "the legal framework governing the Commission's obligations in this area," *id.* at 13,256 ¶ 32, and on how to define significant environmental effects in this context. Additionally, the Commission invited comment on whether it should amend its environmental rules or take action "to reduce the number of instances in which migratory birds collide with communications towers." *Id.* at 13,242 ¶ 1, 13,258

¶ 34. The Commission "tentatively" proposed that communications towers use "medium intensity white strobe lights" rather than red lights that may present a higher risk of tower kill. *Id.* at 13,242-43 ¶ 3. The comment period in the nationwide rulemaking proceeding closed in May 2007, but the Commission has yet to take final action.

Meanwhile, in May 2006, Petitioners sought review of the *Order*. *See* 47 U.S.C. § 403(a); 28 U.S.C. § 2342(1). Petitioners have standing, for members of these organizations engage in recreational birdwatching and research on birds in the Gulf Coast region, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992), and we proceed to review the *Order* to determine whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A).[1]

---

[1] Our dissenting colleague's assertion that this case is unripe, Dis. Op. at 1, rests on the mistaken assumption that the Commission has set about reconsidering Petitioners' precise requests through its nationwide inquiry into the migratory bird issue. However, the NPRM issued several months after the *Order* nowhere indicates that the Commission is reconsidering the Gulf Coast petition calling for a programmatic EIS under NEPA, formal consultation under the ESA, or notice of pending tower registration applications. Instead, the Commission sought comment on only (1) "the legal framework governing the Commission's obligations in this area, and in particular the threshold necessary to demonstrate an environmental problem that would authorize or require that the Commission take action," *NPRM*, 21 F.C.C.R. at 13,256; (2) "particular steps the Commission might take if there is probative evidence of a sufficient environmental effect to warrant Commission action" such as lighting specifications, use of guy wires, tower height, etc., *id.*; and (3) "whether to add an additional criterion for requiring an [environmental assessment] to Section 1.1307(a) of our rules," *id.* at 13,257. At best, the Commission's consideration of the "legal framework" may better inform it of the

**II.**

Petitioners contend that the MBTA, NEPA, and ESA require changes to the Commission's rules and procedures

---

relevant standards triggering its NEPA and ESA obligations, suggesting that if Petitioners were to file a new petition in the future their requests might receive a different response, but this hardly amounts to a reconsideration of the Gulf Coast petition. In any event, such "purely legal" issues are generally fit for review, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967); *Atlantic States Legal Foundation v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003), and agencies cannot avoid judicial review of their final actions merely because they have opened another docket that may address some related matters, *see* 5 U.S.C. § 706(1); *Am. Paper Inst. v. EPA,* 996 F.2d 346, 354 n.8 (D.C. Cir. 1993); *Am. Petroleum Inst. v.* EPA, 906 F.2d 729, 739-40 (D.C. Cir. 1990); *see Telecomms. Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984). Neither point is lost on the Commission: not only does its brief not invoke the ripeness doctrine, but while the Commission explicitly deferred consideration of Petitioners' MBTA claim to the nationwide proceeding, it denied and dismissed Petitioners' ESA and NEPA claims.

The cases on which our colleague relies are inapposite. Petitioners did not file a petition for Commission reconsideration, as occurred in *Melcher v. FCC*, 134 F.3d 1143 (D.C. Cir. 1998), and *Wade v. FCC*, 986 F.2d 1433 (D.C. Cir. 1993). Neither have Petitioners filed a new petition on which the Commission has yet to act, as was true in *Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 236 (D.C. Cir. 1988). Nor, unlike in *Toca Producers v. FERC*, 411 F.3d 262 (D.C. Cir. 2005), was the Commission's dismissal of the Gulf Coast petition conditional, and, unlike the challenged plan in *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998), the *Order* has legal effect.

regarding communications towers in the Gulf Coast region. *See* 47 C.F.R. Part 17.

**A.**

The MBTA provides, with certain exceptions, that it shall be unlawful "to pursue, hunt, take, capture, [or] kill" any migratory bird. 16 U.S.C. § 703. The court has held that the MBTA applies to federal agencies. *Humane Soc'y of the United States v. Glickman*, 217 F.3d 882, 885-86 (D.C. Cir. 2000). Petitioners contend that the Commission unlawfully "takes" migratory birds when birds die in collisions with Commission-licensed towers and sought to have the Commission comply with the MBTA "by taking steps to reduce or eliminate intentional or unintentional 'takes' of migratory birds." Gulf Coast Petition at 20.

The Commission stated in the *Order* that it was analyzing the MBTA issue in the ongoing nationwide proceeding and would therefore defer consideration of the MBTA issue to that docket. Collisions of birds and towers occur throughout the United States and the nationwide proceeding was designed to obtain additional relevant information. We thus conclude that the Commission acted reasonably in deferring consideration of this issue. *See Mobil Oil Exploration & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991); *see also FCC v. Schreiber*, 381 U.S. 279, 290-91 (1965).

**B.**

NEPA does not impose substantive environmental mandates, but it does require federal agencies to establish procedures to account for the environmental effects of certain proposed actions. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004). In particular, for "major Federal actions significantly affecting the quality of the human environment," agencies must prepare an EIS that examines, among other

things, the adverse environmental effects of a proposed action and potential alternatives. 42 U.S.C. § 4332(2)(C). Petitioners contend that NEPA requires the Commission to prepare a programmatic EIS to assess the environmental impact of towers in the Gulf Coast region.

The regulations issued by the Council on Environmental Quality ("CEQ") to implement NEPA include as a "major Federal action" approvals by Executive Branch agencies of specific projects "by permit or other regulatory decision." 40 C.F.R. § 1508.18(b)(4). The regulations allow agencies to divide their actions into three categories: those that ordinarily require an EIS; those that require an initial, less rigorous "environmental assessment" ("EA") but not necessarily an EIS; and those that are "categorically excluded" and require neither an EIS nor an EA. *Id.* § 1507.3(b)(2). Agencies implementing categorical exclusions "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.* §§ 1508.4, 1507.3(b)(1). CEQ regulations also provide that an agency should prepare a programmatic EIS if actions are "connected," "cumulative," or "similar," such that their environmental effects are best considered in a single impact statement. *Id.* § 1508.25(a); *see also Kleppe v. Sierra Club,* 427 U.S. 390, 409-10 (1976); *Nevada v. Dep't of Energy*, 457 F.3d 78, 92 (D.C. Cir. 2006).

The Commission's regulations implementing NEPA categorically exclude communications towers from environmental processing because towers "are deemed individually and cumulatively to have no significant effect on the quality of the human environment." 47 C.F.R. § 1.1306(a). However, a party may still allege that a "particular action, otherwise categorically excluded, will have a significant environmental effect" and can file a petition "setting forth in detail the reasons justifying or circumstances necessitating

environmental considerations in the decision-making process." *Id.* § 1.1307(c). If the Commission determines that the proposed action "may have a significant environmental impact," then it will require the applicant for a tower license to prepare an EA, *id.*, and also may obtain additional information, *id.* § 1.1308(b). Upon analysis of the EA, the Commission must do one of two things: (1) if the Commission determines that the proposed action "would not have a significant impact, it will make a finding of no significant impact" ("FONSI"), *id.* § 1.1308(d); (2) if the EA indicates that the proposed action "will have a significant effect upon the environment," the Commission must prepare an EIS, *id.* § 1.1314(a); *see also* 40 C.F.R. § 1508.3 (stating that the term "[a]ffecting" in NEPA means "will or may have an effect on").

The Commission gave two reasons for dismissing the request for a programmatic EIS: (1) "the lack of specific evidence . . . concerning the impact of towers on the human environment," and (2) "the lack of consensus among scientists regarding the impact of communications towers on migratory birds." *Order*, 21 F.C.C.R. at 4466 ¶ 11. Neither reason is sufficient to sustain the Commission's refusal to take action pursuant to NEPA, and together they demonstrate an apparent misunderstanding of the nature of the obligation imposed by the statute.

Most simply, the *Order* fails to follow the Commission's own regulations implementing NEPA. Under 47 C.F.R. § 1.1307(c), interested persons can request analysis under NEPA of actions that are otherwise categorically excluded. Such persons "shall submit to the Bureau responsible for processing that action a written petition setting forth in detail the reasons justifying or circumstances necessitating environmental consideration in the decision-making process." *Id.* The Commission's Bureau must then "review the petition and

consider the environmental concerns that have been raised." *Id.* "If the Bureau determines that the action may have a significant environmental impact, the Bureau will require the applicant to prepare an EA . . . , which will serve as the basis for the determination to proceed with or terminate environmental processing." *Id.*

The reasons stated in the *Order* cannot, in light of the petition under review, sustain the Commission's refusal to prepare an EIS without at least first requiring the preparation of an EA. The Commission acknowledges that § 1.1307(c) applies to the petition, *see* Appellee's Br. at 25, and that the regulation requires an EA when an action "may" have a significant environmental effect, *see NPRM*, 21 F.C.C.R. at 13,247 (stating that "an EA shall be required pursuant to Section 1.1307(c) or (d) if the Bureau processing an otherwise categorically excluded action finds, in response to a petition or on its own motion, that the proposed construction may have a significant environmental impact."). The *Order*'s demand for definitive evidence of significant effects – noting Petitioners' failure to make a "scientific showing that the population of any specific bird species has decreased as a result of collisions" – plainly contravenes the "may" standard. *Order,* 21 F.C.C.R. at 4466 ¶ 9. Similarly, the *Order*'s suggestion that scientific consensus is a precondition to NEPA action is inconsistent with both the Commission's regulation and with the statute. As the court has admonished, "[i]t must be remembered that the basic thrust of the agency's responsibilities under NEPA is to predict the environmental effects of a proposed action before the action is taken and those effects fully known." *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1091-92 (D.C. Cir. 1973). A precondition of certainty before initiating NEPA procedures would jeopardize NEPA's purpose to ensure that agencies consider environmental impacts before they act rather than wait until it is too late.

Based on the record before the court, there is no real dispute that towers "may" have significant environmental impact, and thus that the § 1.1307(c) threshold has been met. Indeed, the *Order*'s emphasis on "conflicting studies" and "sharply divergent views" regarding the number of birds killed confirms, rather than refutes, that towers may have the requisite effect. *Order,* 21 F.C.C.R. at 4466 ¶ 10. Under such circumstances, the Commission's regulations mandate at least the completion of an EA before the Commission may refuse to prepare a programmatic EIS. Although Petitioners seek a programmatic EIS, and not an EA, the Commission's regulations allow it to pursue an EA as an interim step, and such an EA will determine what subsequent action NEPA requires. The agency may issue a FONSI pursuant to 40 C.F.R. § 1508.13 and 47 C.F.R. § 1.1308(d) "[i]f on the basis of the [EA] the agency finds that the proposed action will produce 'no significant impact' on the environment." *Sierra Club v. Peterson*, 717 F.2d 1409, 1412-13 (D.C. Cir. 1983); *see also*, *e.g.*, *Nat'l Audubon Soc'y v. Hester*, 801 F.2d, 405, 407 (D.C. Cir. 1986); *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 126 n.3 (D.C. Cir. 1985); *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982). But if "*any* 'significant' environmental impacts might result from the proposed agency action, then an EIS must be prepared *before* the action is taken." *Sierra Club*, 717 F.2d at 1415 (emphasis in original); *see also, e.g.*, *Town of Cave Creek, Ariz. v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003); *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998); *North Carolina v. FAA*, 957 F.2d 1125, 1131 (4th Cir. 1992); *Citizen Advocates for Responsible Expansion, Inc. v. Dole*, 770 F.2d 423, 432-33 (5th Cir. 1985).

We vacate the NEPA part of the *Order*. On remand the Commission shall address Petitioners' request that it conduct a

programmatic EIS based on a threshold for NEPA analysis that is less stringent than the *Order* reflects. Conflicting data points do not forestall NEPA's mandate. Pursuant to its own regulations, the Commission may commence such analysis through the preparation of an EA.

## C.

Section 7 of the ESA requires federal agencies to ensure that any "action" they authorize, fund, or carry out is not likely to "jeopardize the continued existence of any endangered [] or threatened species," or result in the destruction or adverse modification of critical habitats. 16 U.S.C. § 1536(a)(2). Regulations promulgated by the Endangered Species Committee (which is comprised of several federal agencies) define "action" to mean "all activities or programs of any kind," including "the granting of licenses." 50 C.F.R. § 402.02. They also provide that each Federal agency "shall confer" with the FWS "on any action which is likely to jeopardize the continued existence of any proposed species or result in the destruction or adverse modification of proposed critical habitat." *Id*. § 402.10; *see also* 16 U.S.C. § 1536(a)(4). If an agency determines that an action "may affect" endangered or threatened species or critical habitats, the agency must initiate formal consultation with the [FWS], at least unless preparation of a biological assessment or participation in informal consultation indicates that a proposed action is "not likely" to have an adverse affect. 50 C.F.R. § 402.14(a)-(b). Petitioners requested that the Commission formally consult with the FWS regarding the cumulative effects of towers on endangered and threatened species.

The Commission declined to consult with the FWS, stating that there is "no evidence of any synergies" among towers that "would cause them cumulatively to have significant environmental impacts that they do not have individually." *Order*, 21 F.C.C.R. at 4,467 ¶ 14. The Commission's reliance

on a lack of "synergies" was not further explained in the *Order*. This explanation was inadequate. The Commission has not described what kind of showing in the ESA context could demonstrate sufficient environmental effects to justify the "programmatic consultation" that Petitioners seek. Short of Petitioners conducting a programmatic EIS themselves, it is unclear how Petitioners could produce sufficient evidence to meet this standard.

We vacate the ESA part of the *Order* and remand that issue.

**D.**

The CEQ regulations require agencies to make "diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a). Commission regulations permit parties to file petitions for EAs to be conducted for the otherwise categorically excluded tower applications. 47 C.F.R. § 1.1307(c). Petitioners requested that the Commission provide adequate public notice of proposed individual tower applications so that they may seek environmental review before the Commission acts.

The Catch-22 for the interested parties who wish to file such a petition is that the Commission provides public notice of individual tower applications only *after* approving them. Although the Commission "enjoys wide discretion in fashioning its own procedures," *City of Angels Broadcasting, Inc. v. FCC*, 745 F.2d 656, 664 (D.C. Cir. 1984), it cannot evade its duty to comply with the CEQ regulations and its own regulations allowing challenges to tower applications by providing the public with a hollow opportunity to participate in NEPA procedures. Interested persons cannot request an EA for actions they do not know about, much less for actions already completed. It was suggested during oral argument that a simple solution would be for the Commission to update its website

when it receives individual tower applications; Petitioners stated that such a step would address their NEPA notice claim.

We vacate the notice part of the *Order* and remand for the Commission to determine how it will provide notice of pending tower applications that will ensure meaningful public involvement in implementing NEPA procedures.

Accordingly, except as regards deferral of the MBTA issue, we vacate the *Order* and remand the case to the Commission to comply with NEPA and ESA. The results of the NPRM may inform the Commission's decision on remand, but the nationwide proceeding neither incorporates nor supplants the Gulf Coast petition. The Commission has amassed a wealth of information during the past five years, including reports from other federal agencies such as the FWS, a report from its own consultant in 2004, as well as a second round of comments from interested persons. Guided by this opinion, the Commission should be able to proceed with dispatch on remand to resolve the Gulf Coast petition, whether separately or as part of the nationwide proceeding.

KAVANAUGH, *Circuit Judge*, dissenting: Petitioners American Bird Conservancy and Forest Conservation Council are concerned about the effects of communications towers on birds. Here, they challenge an FCC order that addressed the requirements of federal environmental laws for communications towers in the Gulf Coast region of the United States. I would dismiss their lawsuit as unripe because the FCC, in a separate rulemaking proceeding, is re-examining these environmental issues and considering the effects of communications towers on birds *nationwide*, including in the Gulf Coast region. The Commission has gathered considerable factual information and input from interested parties – including from the petitioners in this case – and the FCC's counsel represented to the Court that the Commission expects to act soon.

This case is thus closely analogous to a situation in which a petitioner comes to court to challenge an agency order while the agency is still considering a petition for reconsideration. We routinely dismiss such cases. *See*, *e.g*., *Melcher v. FCC*, 134 F.3d 1143, 1163 (D.C. Cir. 1998) ("If a party determines to seek reconsideration of an agency ruling, it is a pointless waste of judicial energy for the court to process any petition for review before the agency has acted on the request for reconsideration.") (internal quotation marks omitted); *Wade v. FCC*, 986 F.2d 1433, 1434 (D.C. Cir. 1993) ("The danger of wasted judicial effort that attends the simultaneous exercise of judicial and agency jurisdiction arises whether a party seeks agency reconsideration before, simultaneous with, or after filing an appeal or petition for judicial review.") (citation omitted).

Even if the Gulf Coast order in isolation is technically final, our ripeness precedents suggest that, at least in these unusual circumstances, we should allow the ongoing administrative process to run its course before we intervene. *See Devia v. NRC*, 492 F.3d 421, 424 (D.C. Cir. 2007)

("Article III courts should not make decisions unless they have to.") (internal quotation marks omitted); *Toca Producers v. FERC*, 411 F.3d 262, 266 (D.C. Cir. 2005) (although the challenged orders appeared to be "final agency action within the meaning of the Administrative Procedure Act," orders were not "sufficiently final" for judicial review because agency's action in separate docket could "resolv[e] the issues raised" in the appeal) (internal quotation marks omitted); *Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 236 (D.C. Cir. 1988) (court "may properly give weight to the interests in judicial economy that are furthered by the avoidance of unnecessary adjudication"); *cf. Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (describing the "usually unspoken element of the rationale underlying the ripeness doctrine: If we do not decide it now, we may never need to. Not only does this rationale protect the expenditure of judicial resources, but it comports with our theoretical role as the governmental branch of last resort.").

Dismissing this case on ripeness grounds would serve the interests of judicial economy, permit the Executive Branch to carefully re-examine and resolve environmental issues related to communications towers and birds on a nationwide basis, and impose minimal hardship on the petitioners who are themselves participating in the nationwide rulemaking proceeding. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733-35 (1998) (further administrative or judicial proceedings are not sufficient hardship to justify review in a case that would otherwise be unripe); *AT&T Corp. v. FCC*, 349 F.3d 692, 700 (D.C. Cir. 2003) ("If the only hardship a claimant will endure as a result of delaying consideration of the disputed issue is the burden of having to engage in another suit, this will not suffice to overcome an agency's challenge to ripeness.") (internal quotation marks and alterations omitted); *cf. Friends of Keeseville*, 859 F.2d at 237

(petitioner's present injury is less significant when judicial relief "is deferred but not denied").

As a matter of prudence and judicial restraint, I therefore would dismiss this case as unripe. I respectfully dissent.[1]

---

[1] The majority opinion quotes the FCC's NEPA regulations, which have been in place for 20 years and were coordinated with the Council on Environmental Quality; these regulations require the Commission to prepare an EIS when a proposed action "will have" a significant environmental impact. Maj. Op. at 9 (quoting 47 C.F.R. § 1.1314(a)); *see also* 47 C.F.R. § 1.1308(c). I do not interpret the majority opinion to suggest (much less hold) that the "will have" standard set forth in the FCC regulations is invalid. *See generally Nat'l Audubon Soc'y v. Hester*, 801 F.2d 405, 407 (D.C. Cir. 1986) ("will significantly affect"); *Sierra Club v. Dep't of Transp.*, 753 F.2d 120, 126 (D.C. Cir. 1985) ("will significantly affect"); *Sierra Club v. Peterson,* 717 F.2d 1409, 1412 (D.C. Cir. 1983) ("will significantly affect"); *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982) (EIS required "when significant environmental impacts will occur"); *Envtl. Def. Fund, Inc. v. EPA*, 489 F.2d 1247, 1255 (D.C. Cir. 1973) ("will have a significant effect").