# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

–––––––

Argued March 22, 2011          Decided July 1, 2011

No. 10-1050

IN RE: AIKEN COUNTY,
PETITIONER

–––––––

On Petitions for Declaratory and Injunctive Relief, Petitions
for Extraordinary Relief, and Petitions for Review

–––––––

Consolidated with 10-1052, 10-1069, 10-1082

–––––––

*Andrew A. Fitz*, Assistant Attorney General, Office of the
Attorney General for the State of Washington, and *Barry M.
Hartman* argued the cause for petitioners. With them on the
briefs were *Thomas R. Gottshall*, *Alexander Shissias*, *S. Ross
Shealy*, *Alan Wilson*, Attorney General, Office of the Attorney
General for the State of South Carolina, *Robert M. McKenna*,
Attorney General, Office of the Attorney General for the State
of Washington, *Todd R. Bowers*, Assistant Attorney General for
the State of Washington, *Christopher R. Nestor*, *William Henry
Davidson II*, *Kenneth Paul Woodington*, *James Bradford
Ramsay* and *Robin J. Lunt*.

*Michael A. Bauser* and *Anne W. Cottingham* were on the
brief for *amicus curiae* Nuclear Energy Institute in support of
petitioners.

*Ellen J. Durkee*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief were *Robert Dreher*, Principal Deputy Assistant Attorney General, *Lisa E. Jones*, *Aaron P. Avila*, and *Allen Brabender*, Attorneys, U.S. Department of Justice, *John F. Cordes Jr.*, Solicitor, Nuclear Regulatory Commission, *Charles E. Mullins*, Senior Attorney, Nuclear Regulatory Commission, and *Jeremy M. Suttenberg*, Attorney, Nuclear Regulatory Commission.

*Martin G. Malsch*, *Charles J. Fitzpatrick*, and *John W. Lawrence* were on the brief for intervenor State of Nevada in support of respondents.

Before: SENTELLE, *Chief Judge*, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* BROWN.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

SENTELLE, *Chief Judge*: Three state and local governmental units, along with individual citizens, petition this court for review of and other relief from two "determinations" made by the Department of Energy ("DOE") and the other respondents: the DOE's attempt to withdraw the application it submitted to the Nuclear Regulatory Commission ("NRC" or the "Commission") for a license to construct a permanent nuclear waste repository at Yucca Mountain, Nevada; and the DOE's apparent decision to abandon development of the Yucca Mountain nuclear waste repository. Because we believe that Petitioners' two claims are, respectively, not ripe for judicial determination and not justiciable by this court, we dismiss the petitions for lack of jurisdiction.

3

**I.**

This case once again brings before this court the federal government's controversial ongoing attempt to devise a permanent solution to the problems of civilian radioactive waste disposal. *See, e.g.*, *Nevada v. DOE*, 457 F.3d 78 (D.C. Cir. 2006) (challenging the DOE's Final Environmental Impact Statement and Record of Decision for the Yucca Mountain nuclear waste repository); *Nevada v. DOE*, 400 F.3d 9 (D.C. Cir. 2005) (challenging a DOE order denying Nevada a grant to fund its participation in an NRC proceeding regarding Yucca Mountain); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004) (challenging a congressional joint resolution and the associated federal regulations selecting Yucca Mountain as the site for the federal nuclear repository); *Northern States Power Co. v. DOE*, 128 F.3d 754 (D.C. Cir. 1997) (requesting a writ of mandamus requiring DOE to comply with the Nuclear Waste Policy Act). The present petitioners argue that recent actions taken by the DOE—which at the very least demonstrate the DOE's desire to abandon development of the Yucca Mountain nuclear waste repository—violate the Nuclear Waste Policy Act ("NWPA"), the National Environmental Policy Act, and the Administrative Procedure Act ("APA"). Three of the petitioners—Aiken County in South Carolina, the State of South Carolina, and the State of Washington—are state or local governments of localities that are home to sites that temporarily store spent nuclear fuel and high-level radioactive waste pending the opening of a federal nuclear waste repository. The remaining petitioners are three private citizens who live and work near one of those sites. Put succinctly, Petitioners believe that if the federal government abandons the Yucca Mountain nuclear repository, the only congressionally-approved site for permanently disposing of the nation's spent nuclear waste will be lost and the federal government will fail to comply with its

4

statutory responsibility to provide for the permanent disposal of all of the nation's high-level radioactive waste.

Congress imposed that responsibility upon the federal government in 1983 when it enacted the NWPA, Pub. L. No. 97-425, 96 Stat. 2201 (1983) (codified as amended at 42 U.S.C. §§ 10101-270). Recognizing that "Federal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal [had] not been adequate," 42 U.S.C. § 10131(a)(3), Congress passed the NWPA "to establish a schedule for the siting, construction, and operation of repositories" for the disposal of spent nuclear fuel and high-level radioactive waste. 42 U.S.C. § 10131(b)(1). As originally enacted, the NWPA set forth a process by which the DOE would first identify five repositories "determine[d] suitable for site characterization for selection of the first repository site." 42 U.S.C. § 10132(b)(1)(A). After performing environmental assessments of each of those first five potential sites, the NWPA required the DOE to recommend three of the sites to the President for characterization as candidate sites no later than January 1, 1985. 42 U.S.C. § 10132(b)(1)(B), (E). In 1987, after the DOE had recommended the Yucca Mountain site as well as sites in Washington and Texas to the President, Congress short-circuited the original process and amended the NWPA to designate Yucca Mountain as the only site for possible development as a repository. Congress ordered the DOE to "provide for an orderly phase-out of site specific activities at all candidate sites other than the Yucca Mountain site." 42 U.S.C. § 10172(a)(1).

After Congress specified Yucca Mountain as the sole potential location for the nation's nuclear waste repository, the DOE moved on to the site characterization, approval, review, and licensing phase of the process created by the NWPA. *See* 42 U.S.C. §§ 10133-38. Over the next fifteen years, the DOE

performed site characterization activities at Yucca Mountain, and in 2002, the DOE recommended "that Yucca Mountain be developed as the site for an underground repository for spent fuel and other radioactive wastes." Recommendation by the Secretary of Energy Regarding the Suitability of the Yucca Mountain Site for a Repository Under the Nuclear Waste Policy Act of 1982 at 1 (Feb. 2002). As expressly permitted by the NWPA, the State of Nevada submitted an official objection to the DOE's recommendation, halting consideration of the Yucca Mountain site. *See* 42 U.S.C. § 10135(b). Congress overcame this objection by passing a joint resolution "affirmatively and finally approv[ing] the Yucca site for a repository, thus bringing the site-selection process to a conclusion." *Nuclear Energy Inst.*, 373 F.3d at 1309; *see also* Pub. L. No. 107-200, 116 Stat. 735 (2002) (codified at 42 U.S.C. § 10135 note).

The NWPA next directed the DOE to "submit to the Commission an application for a construction authorization for a repository at such site." 42 U.S.C. § 10134(b). Although the NWPA required that the DOE submit this application within ninety days of the site designation becoming effective, *id*., the DOE did not submit the Yucca Mountain application for another six years. Finally, on June 17, 2008, the DOE submitted the application and the Commission docketed it for review by its Atomic Safety and Licensing Board ("Licensing Board"). *See* Department of Energy; Notice of Acceptance for Docketing of a License Application for Authority to Construct a Geologic Repository at a Geologic Repository Operations Area at Yucca Mountain, NV, 73 Fed. Reg. 53,284 (Sept. 15, 2008). The NRC's Licensing Board began its review of the Yucca Mountain application, but on March 3, 2010, the DOE filed a motion to withdraw its application with prejudice. *See* Dep't of Energy Motion to Withdraw, *In re U.S. Dep't of Energy (High-Level Waste Repository)*, Docket No. 63-001, ASLBP No. 09-892-HLW-CAB04 (United States Nuclear Regulatory Commission)

(Mar. 3, 2010). In its motion, the DOE stated that although it "reaffirms its obligation to take possession and dispose of the nation's spent nuclear fuel and high-level nuclear waste, the Secretary of Energy has decided that a geologic repository at Yucca Mountain is not a workable option for long-term disposition of these materials." *Id*. at 1. The DOE clarified that it sought to dismiss the application with prejudice "because it does not intend ever to refile an application to construct a permanent geologic repository . . . at Yucca Mountain." *Id*. at 3 & n.3.

On June 29, 2010, the NRC Licensing Board denied the DOE's motion to withdraw. Order of Atomic Safety and Licensing Board, *In re U.S. Dep't of Energy (High-Level Waste Repository*), Docket No. 63-001, ASLBP No. 09-892-HLW-CAB04 (United States Nuclear Regulatory Commission) (June 29, 2010). Noting that the DOE conceded that the Yucca Mountain license application was not defective nor the site unsafe, the Licensing Board concluded that the NWPA "does not permit the Secretary [of the DOE] to withdraw the Application that the NWPA mandates the Secretary file." *Id*. at 3. In denying the DOE's motion, the Licensing Board held that "the NWPA does not give the Secretary the discretion to substitute his policy for the one established by Congress in the NWPA that, at this point, mandates progress toward a merits decision by the Nuclear Regulatory Commission on the construction permit." *Id*. The next day, the Secretary of the Commission invited all of the participants before the Licensing Board to file briefs as to whether the Commission should review, reverse, or uphold the Licensing Board's decision to deny the DOE's motion to withdraw. Order, *In re U.S. Dep't of Energy (High-Level Waste Repository*), Docket No. 63-001-HLW (United States Nuclear Regulatory Commission) (June 30, 2010). At this time, both the NRC Licensing Board's review of the DOE Yucca Mountain license application and the

Commission's review of the Licensing Board's denial of the DOE's motion to withdraw are ongoing.

Petitioners identify the DOE's attempt to withdraw its Yucca Mountain license application from consideration by the NRC Licensing Board as the "determination" they seek to have us review. Petitioners argue that the DOE lacks the legal authority to withdraw its application and that the DOE's attempt to do so violates the NWPA. Petitioners' second claim challenges a different "determination:" the DOE's efforts outside of the NRC licensing context "to irrevocably abandon the Yucca Mountain process and terminate the entire Yucca Mountain project." Brief of Petitioners at 42. As evidence that the DOE is abandoning the Yucca Mountain site, Petitioners point to an array of DOE actions including announcing on January 29, 2010 that the DOE was abandoning the Yucca Mountain site and creating a Blue Ribbon Commission to find another way of disposing of high level nuclear waste; withdrawing its Yucca Mountain water permit applications from the State of Nevada; repurposing funds appropriated by Congress for Yucca Mountain; notifying employees supporting the Yucca Mountain license application that they may be separated; and drafting plans to shut down the Yucca Mountain site. Petitioners argue that the NWPA does not authorize the DOE to take actions to abandon Yucca Mountain, that abandoning Yucca Mountain without preparing an Environmental Impact Statement violates the National Environmental Policy Act, and that the action should be overturned as arbitrary and capricious agency action under the APA.

In response, the DOE both disputes the merits of Petitioners' claims and argues that this court lacks jurisdiction to hear their petitions. The DOE makes multiple threshold arguments, contending, *inter alia*, that Petitioners lack standing

before this court, that Petitioners' first claim is unripe for judicial review, that Petitioners fail to state a claim upon which relief can be granted, and that there has been no final agency action which would be reviewable by this court. Any one of these arguments, if correct, would establish that this court lacks the authority to grant relief upon these petitions. Because we agree with the DOE that there is, at least, a lack of finality and ripeness until the Commission either acts on the DOE's motion to withdraw or rules on the license application, we hold that we lack jurisdiction and therefore cannot address either the merits of the petitions or the remaining threshold issues.

## II.

Ripeness is a justiciability doctrine "'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Catholic Soc. Services, Inc.*, 509 U.S. 43, 57 n.18 (1993)). Prudentially, the basic rationale of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). As the Supreme Court has observed, "federal courts may exercise power only 'in the last resort, and as a necessity.'" *Allen v. Wright*, 468 U.S. 737, 752 (1984) (quoting *Chicago & Grand Trunk Railway Co. v. Wellman*, 143 U.S. 339, 345 (1892)). We have noted that it is sometimes true that if we do not decide a case prematurely, we may never need to decide it. *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996). Refusing to involve the courts in ongoing administrative matters both protects judicial

resources and comports with the judiciary's role as the governmental branch of last resort. *Id*. The ripeness doctrine, even in its prudential aspect, is a threshold inquiry that does not involve adjudication on the merits and which may be addressed prior to consideration of other Article III justiciability doctrines. *Toca Producers v. FERC*, 411 F.3d 262, 265 n.\* (D.C. Cir. 2005).

When we apply the ripeness doctrine to review of agency actions, "'we balance the interests of the court and the agency in delaying review against the petitioner's interest in prompt consideration of allegedly unlawful agency action.'" *Toca Producers*, 411 F.3d at 265 (quoting *Fed. Express Corp. v. Mineta*, 373 F.3d 112, 118 (D.C. Cir. 2004)). "The interests of the court and of the agency in withholding judicial review ordinarily depend upon 'the fitness of the issues for judicial decision,'" *id*. at 266 (quoting *Abbott Labs.*, 387 U.S. at 149), which depends, *inter alia*, on whether the issues are purely legal, whether consideration of the issues would benefit from a more concrete setting, and whether the agency's actions are sufficiently final. *CTIA–The Wireless Ass'n v. FCC*, 530 F.3d 984, 987 (D.C. Cir. 2008); *Atl. States Legal Found., Inc. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003). "But when an agency decision may never have its effects felt in a concrete way by the challenging parties, the prospect of entangling ourselves in a challenge to such a decision is an element of the fitness determination as well." *Devia v. NRC*, 492 F.3d 421, 424 (D.C. Cir. 2007) (internal citation and quotation marks omitted). "Hence, a 'claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id*. (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal citation and quotation marks omitted)).

In this case, Petitioners fear that the DOE will withdraw its Yucca Mountain license application, significantly delaying or perhaps permanently preventing the construction of the Yucca Mountain repository. If the Yucca Mountain repository never opens, Petitioners argue, the federal government will never remove the nuclear waste temporarily stored within their jurisdictions or near where they live, despite the federal government's responsibility for doing so. This fear is not unreasonable, considering that the NWPA ordered the DOE to "terminate all site specific activities (other than reclamation activities) at all candidate sites, other than the Yucca Mountain site." 42 U.S.C. § 10172(a)(2). But despite the reasonableness of Petitioners' fears, their petitions are premature.

## A.

Petitioners' first claim challenges the DOE's attempt to withdraw its Yucca Mountain construction license application from consideration by the Commission. At this stage of the administrative process, however, the DOE has no say in whether the Yucca Mountain license application will be reviewed and granted. That power lies exclusively with the Secretary of the Commission and the NRC Licensing Board, which already denied the DOE's motion to withdraw the license application and still has the responsibility and authority to review the merits of the Yucca Mountain application. There are two ongoing NRC administrative procedures—the Commission's review of the Licensing Board's denial of the DOE motion to withdraw and the Licensing Board's review of the Yucca Mountain construction license application—both of which have the potential to moot Petitioners' first claim entirely.

First, the Commission has not yet decided whether it will review the Licensing Board's denial of the DOE motion to withdraw. If the Commission declines to review the denial, the

DOE will have failed in its attempt to withdraw the Yucca Mountain application and Petitioners' first claim will be moot. The same outcome will occur if the Commission chooses to review and then upholds the Licensing Board's denial of the DOE motion. The only way in which Petitioner's first claim will not become moot is if the Commission chooses to review and then reverses the Licensing Board's denial.

Second, independent of the Commission's review of the Licensing Board's denial order, the NRC Licensing Board's consideration of the DOE Yucca Mountain license application has not been completed. Although Petitioners point to evidence that the Commission has suspended the Licensing Board's review, we note that the NWPA requires the Commission to review the application, *see* 42 U.S.C. § 10134(d) ("The Commission shall consider an application for a construction authorization for all or part of a repository . . . ."), and therefore we must assume that the Commission will comply with its statutory mandate. If the Licensing Board denies the application, consideration of Yucca Mountain as a location for the federal nuclear waste repository will come to an end. Although this outcome will not remedy the harm that Petitioners potentially face—indefinite exposure to the nuclear waste temporarily stored at sites in Washington and South Carolina—the Licensing Board's disapproval of Yucca Mountain on technical and scientific grounds will be a final agency action that Petitioners may challenge under the APA. On the other hand, if the Licensing Board approves the application, the Commission will issue a construction license for Yucca Mountain, which would complete the process mandated in the NWPA and remove the legal basis of Petitioners' first claim (i.e. the failure of Respondents to comply with the process mandated by Congress).

Between the Commission's possible review of the denial order and the Licensing Board's consideration of the Yucca Mountain license application, the only administrative outcome that will fail to resolve the issues presented in Petitioner's first claim would be if the Commission reviews and overturns the Licensing Board's denial, permitting the DOE to withdraw its license application. At that point, petitioners would have the opportunity to demonstrate whether the effects of the DOE action are "'felt in a concrete way by the challenging parties.'" *See Devia*, 492 F.3d at 424 (quoting *Abbott Labs.*, 387 U.S. at 148-49). Petitioners' first claim, therefore, is not fit for judicial decision because "it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.* (quoting *Texas v. United States*, 523 U.S. at 300 (internal citations and quotation marks omitted)).

Looking to the other aspect of the prudential ripeness analysis, delaying review of the issues in this case causes little harm to Petitioners' interest in prompt consideration of allegedly unlawful agency action. As we noted above, the NWPA requires the Commission to "issue a final decision approving or disapproving the issuance of a construction authorization not later than the expiration of 3 years after the date of the submission of such application, except that the Commission may extend such deadline by not more than 12 months" subject to specified reporting requirements. 42 U.S.C. §§ 10134(d)-(e). Without an extension, the three-year statutory deadline for the Commission to issue its final decision on the DOE's Yucca Mountain application—submitted on June 17, 2008—has potentially already come and gone.[1] Very soon, the

---

[1] At oral argument, the DOE suggested that the three-year deadline should toll from September 15, 2008, the date when the application was docketed, rather than from when the application was submitted. We offer no opinion on the correctness of that suggestion, but note that in either case, the deadline for the Commission to act is at hand.

contingencies discussed above should be resolved and Petitioners—and importantly this court—will know whether the Commission will permit the DOE to withdraw the Yucca Mountain license application, and if not, whether the Commission approves or disapproves the application. Should the Commission fail to act within the deadline specified in the NWPA, Petitioners would have a new cause of action under this court's ruling in *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (hereinafter "*TRAC*"). In *TRAC*, we held that the Courts of Appeals have exclusive jurisdiction to issue writs of mandamus to compel agency actions that have been unreasonably delayed. 750 F.2d at 75. Although mandamus is an extraordinary remedy reserved for extraordinary circumstances, "we will interfere with the normal progression of agency proceedings to correct *transparent violations of a clear duty to act*." *In re Am. Rivers and Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (emphasis added) (internal citations and quotation marks omitted). We do so both to protect our own future jurisdiction over the merits of the dispute and because "[i]t is obvious that the benefits of agency expertise and creation of a record will not be realized if the agency never takes action." *Id.* (quoting *TRAC*, 750 F.2d at 76, 79). We will not permit an agency to insulate itself from judicial review by refusing to act. *See, e.g.*, *In re Core Communications, Inc.*, 531 F.3d 849, 861-62 (D.C. Cir. 2008) (granting a writ of mandamus to force the FCC to issue a final appealable order); *Radio-Television News Directors Ass'n v. FCC*, 229 F.3d 269, 308 (D.C. Cir. 2000) (granting a writ of mandamus to vacate an FCC order when the FCC failed to take final action).

Having concluded that Petitioners' challenge of the DOE's motion to withdraw is unfit for judicial decision and that Petitioners' interest in prompt consideration of allegedly unlawful agency action will be only minimally harmed by delay,

we further conclude that Petitioners' first claim is not ripe and is therefore outside of our jurisdiction.

**B.**

Petitioners' second claim challenges DOE actions which are simply not reviewable by this court. Petitioners characterize the agency action challenged in their second claim as the "determination made on or about January 29, 2010, by Respondents President Obama, Secretary Chu and DOE to unilaterally and irrevocably terminate the Yucca Mountain repository process mandated by the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270." Agency actions are reviewable by courts of appeal under the terms of 5 U.S.C. § 704. That section delineates reviewable actions as "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court . . . ." Petitioners have failed to identify any agency action coming within that delineation. Otherwise put, petitioners have set forth no discrete action mandated by the NWPA that the DOE has failed to perform or performed inadequately. In 42 U.S.C. § 10134(b), Congress ordered the DOE to "submit to the Commission an application for a construction authorization for a repository." The DOE completed this task on June 17, 2008, and its application is currently under review by the NRC Licensing Board. Despite the DOE's publicly stated desire and intention to abandon the Yucca Mountain repository, the DOE has shown us nothing that grants it the authority or ability to stop the NRC Licensing Board from continuing its congressionally-mandated review and has entered no order or official decision inconsistent with its statutory duty. *See* 42 U.S.C. § 10134(d). Unable to point to any unlawful action by the DOE, Petitioners challenge DOE's public announcement regarding Yucca Mountain. Neither the NWPA nor the APA authorizes this type of legal attack.

The DOE's policy announcement, which has no legal consequence, is not a "final decision or action of the Secretary" or a "final agency action" as required by 42 U.S.C. § 10139(a)(1)(A) and 5 U.S.C. § 704 . *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that "final" agency action must both mark consummation of an agency's decision making process and either determine rights or obligations or be an action from which legal consequences will flow). Nor, at this stage of the ongoing Yucca Mountain saga, has the DOE failed to make any decision or take any action mandated by the NWPA—as required to give this court jurisdiction under 42 U.S.C. § 10139(a)(1)(B)—or made a decision or taken an action which violates the Constitution—as required to give this court jurisdiction under 42 U.S.C. § 10139(a)(1)(C). Likewise, since the DOE has not taken any action prohibited under the NWPA or failed to take any action required by the NWPA, the DOE's failure to prepare an environmental impact statement before making its announcement, as would otherwise have been required by 42 U.S.C. § 10139(a)(1)(D), is not yet an official, reviewable decision. Finally, to the extent that Petitioners wish to "compel agency action unlawfully withheld" based on the language of 5 U.S.C. § 706(1), "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original). At least to this date, the DOE has not failed to take any discrete agency action that Congress ordered it to take. Petitioners' general complaints about the DOE's new policy regarding Yucca Mountain are simply not justiciable. *See Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("Because an on-going program or policy is not, in itself, a 'final agency action' under the APA, our jurisdiction does not extend to reviewing generalized complaints about agency behavior." (quotation and citation omitted)).

**III.**

The NWPA set forth a process and schedule for the siting, construction, and operation of a federal repository for the disposal of spent nuclear fuel and high-level radioactive waste. At this point in that process, the DOE has submitted a construction license application for the Yucca Mountain repository and the Commission maintains a statutory duty to review that application. Despite the respondents' pronouncements and apparent intentions, unless and until Petitioners are able to demonstrate that one of the respondents has either violated a clear duty to act or otherwise affirmatively violated the law, Petitioners' challenges to the ongoing administrative process are premature. For the reasons set forth above, we conclude that we lack jurisdiction over Petitioners' claims. The petitions are dismissed.

BROWN, *Circuit Judge*, concurring: I fully concur with the court's opinion. I write separately only to note that after setting the President and his administration firmly in their sights, Petitioners all but ignore the NRC—a named party in this suit and the only agency with an existing obligation under the NWPA. "[O]ur jurisdiction . . . is not limited to situations in which 'final action,' as it is commonly understood, has indeed been taken." *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987). "Agency inaction may represent 'agency recalcitrance . . . in the face of a clear statutory duty . . . of such magnitude that it amounts to an abdication of statutory responsibility.'" *Id.* (quoting *Pub. Citizen Health Research Gr. v. FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984)) (alterations in original). It is arguable the NRC has abdicated its statutory responsibility under the NWPA. The Commissioner publically said:

> The agency budget encompasses the licensing board, so if there is no money for the program, there is no money for licensing activities and for the licensing board itself . . . Our overall focus is on closing out our review of the license application, and so that includes the licensing board, it includes everything that is involved in that. If there were unresolved legal questions, they would stay unresolved legal questions.

Steve Tetreault, *NRC Chairman Says Yucca Mountain Closeout to Include License Panel¸* LAS VEGAS REV. J., Feb. 2, 2011 (quoting Greg Jaczko). But Petitioners simply do not press this agency inaction claim. Despite months of extensive briefing and protracted questioning at oral argument, Petitioners still see only the President and his administration obstructing their path to judicial review. Nietzsche once remarked that "many are stubborn in pursuit of the path they have chosen, few in pursuit of the goal." Such stubbornness may snatch defeat from the jaws of victory.

KAVANAUGH, *Circuit Judge*, concurring:

"No one doubts Congress's power to create a vast and varied federal bureaucracy. But where, in all this, is the role for oversight by an elected President? The Constitution requires that a President chosen by the entire Nation oversee the execution of the laws." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3155-56 (2010).

"The President has been given the power to oversee executive officers; he is not limited, as in Harry Truman's lament, to persuading his unelected subordinates to do what they ought to do without persuasion. In its pursuit of a workable government, Congress cannot reduce the Chief Magistrate to a cajoler-in-chief." *Id.* at 3157 (internal quotation marks, citation, and alteration omitted).

Who in the Executive Branch is ultimately responsible and accountable for deciding whether to terminate the project for storing nuclear waste at Yucca Mountain? Under the text of the Constitution, the answer seems simple: the President of the United States. But it is not so simple. This case illustrates the point. Given the importance and bitterness of the underlying dispute over Yucca Mountain, I think it worth exploring how we got here, constitutionally speaking.

I

The Department of Energy and the Nuclear Regulatory Commission are both agencies in the Executive Branch. *See* 5 U.S.C. § 105; 42 U.S.C. § 7131 (Department of Energy); 42 U.S.C. § 5841 (Nuclear Regulatory Commission). As a result of the Supreme Court's 1935 decision in *Humphrey's Executor v. United States*, 295 U.S. 602, there are two kinds of agencies in the Executive Branch: executive agencies and

independent agencies. The Secretary of Energy is removable by the President at will, meaning the Department of Energy is an executive agency that the President has authority to direct and supervise. By statute, the Commissioners of the Nuclear Regulatory Commission are removable by the President only for cause, not at will, meaning that the Commission is an independent agency that operates free of presidential direction and supervision.

This case is a mess because the executive agency (the Department of Energy) and the independent agency (the Nuclear Regulatory Commission) have overlapping statutory responsibilities with respect to the Yucca Mountain project. In particular, both agencies have critical roles in interpreting the relevant statutes and in exercising discretion under those laws. Of importance here, the statutes give the independent Nuclear Regulatory Commission the final word in the Executive Branch on whether the Executive Branch may terminate the Yucca Mountain project. At the President's direction, the Department of Energy decided to withdraw the Yucca Mountain license application and terminate the Yucca Mountain nuclear storage project. A board within the Nuclear Regulatory Commission preliminarily rejected the decision of the Department of Energy (and thus of the President) to withdraw the Yucca Mountain license application. But the full Nuclear Regulatory Commission has yet to decide whether it will approve or reject the decision of the Department of Energy. Because the Commission has not yet acted on the Department of Energy's request, the Court's opinion today properly holds this case unripe under the existing legal framework.

Taking a step back and reading the Constitution, however, it seems odd that the Nuclear Regulatory Commission has the final word within the Executive Branch on this important issue. One would think that the President of the United States controls the Executive Branch and would be

able to direct the interpretation of law and exercise of discretion by all agencies in the Executive Branch. *See* U.S. CONST. art. II. The first 15 words of Article II state quite plainly that "[t]he executive Power shall be vested in a President of the United States of America" – not some of the executive power, but all of it. And Article II later says that the President alone has the authority and responsibility to "take Care that the Laws be faithfully executed." As Professor Amar has summarized, "What Article II *did* make emphatically clear from start to finish was that the president would be personally responsible for his branch." AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 197 (2005).

The Framers' decision to give the President responsibility for the executive power and to take care that the laws be faithfully executed was not just about the lines on the Executive Branch organizational chart. The Constitution's Framers sought a national government that would be more effective than under the Articles of Confederation (especially in maintaining national security, facilitating economic growth, and raising necessary revenue) and a national government that would be more accountable to the people and more protective of liberty than under the rule of King George III. The Framers were particularly cognizant, moreover, of the link between accountability of officials in the Legislative and Executive Branches and individual liberty. The Framers designed our constitutional structure with the idea that unaccountable power is inconsistent with individual liberty. "The Framers created a structure in which 'a dependence on the people' would be the 'primary control on the government.'" *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3157 (2010) (quoting THE FEDERALIST NO. 51 (Madison)) (alteration omitted).

The President is dependent on the people for election and re-election, but the officers of agencies in the Executive

Branch are not. Presidential control of those agencies thus helps maintain democratic accountability and thereby ensure the people's liberty. *See id; see also Bond v. United States*, No. 09-1227, slip op. at 10 (U.S. June 16, 2011) ("[T]he dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well."); *Clinton v. City of New York,* 524 U.S. 417, 450 (1998) (Kennedy, J., concurring) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers."); *Morrison v. Olson,* 487 U.S. 654, 727 (1988) (Scalia, J., dissenting) ("The purpose of the separation and equilibration of powers in general, and of the unitary Executive in particular, was not merely to assure effective government but to preserve individual freedom.").

Reading only the text of Article II, one would assume that the Nuclear Regulatory Commission would report to the President, not the President to the Nuclear Regulatory Commission. If two agencies in the Executive Branch were not on the same page (as may happen in this case if the Nuclear Regulatory Commission rejects the Department of Energy's withdrawal application), the President presumably would have the authority to resolve that disagreement. If an agency were departing from the President's preferred course (as the Nuclear Regulatory Commission may do), the President presumably would have the authority to prevent that. And if an agency were taking too long to make a critical legal or policy decision (as appears to be the case with the Nuclear Regulatory Commission), the President presumably would have the authority to fix that as well.

But that conception of the constitutional chain of command turns out to be inaccurate with respect to independent agencies such as the Nuclear Regulatory Commission – a consequence of the Supreme Court's 1935 decision in *Humphrey's Executor*. In that case, the Supreme

Court, over the strenuous objection of President Franklin Roosevelt, upheld the constitutionality of independent agencies – that is, agencies whose heads are removable by the President only for cause, not at will, and that thus operate free of presidential direction and supervision.

President Roosevelt wanted to direct and supervise the Federal Trade Commission in the exercise of its statutorily assigned duties and discretion. In 1933, shortly after taking office, he therefore fired Commissioner William Humphrey, who disagreed with the President's views on antitrust and competition issues. Humphrey sued, arguing that under the FTC statute he could be removed only for cause, not at will, and that policy disagreement did not constitute a sufficient basis to be removed for cause. For his part, the President argued that he must be able to remove subordinate executive officers at will in order to exercise the executive power and take care that the laws be faithfully executed. He contended that the statutory restriction on removing Humphrey was unconstitutional under Article II of the Constitution and the Court's landmark decision nine years earlier in *Myers v. United States*, 272 U.S. 52 (1926). In *Myers*, Chief Justice and former President Taft wrote a lengthy opinion for the Court holding that the President possessed the constitutional authority to cause the removal of subordinate officers in the Executive Branch.

Notwithstanding the text of Article II and *Myers*, the Supreme Court in *Humphrey's Executor* sided with Humphrey and ruled that President Roosevelt acted illegally when he fired Humphrey. The *Humphrey's Executor* Court determined that the President's "simple disagreement with the [independent agency's] policies or priorities" did not "constitute 'good cause' for . . . removal." *Free Enterprise*, 130 S. Ct. at 3157.

*Humphrey's Executor* thus approved the creation of "independent" agencies – independent, that is, from presidential control and thus from democratic accountability. *See Humphrey's Executor*, 295 U.S. at 628 (independent agencies "cannot in any proper sense be characterized as an arm or an eye of the executive"); *Buckley v. Valeo*, 424 U.S. 1, 133 (1976) ("The Court in [*Humphrey's Executor*] carefully emphasized that . . . the members of such agencies were to be independent of the Executive in their day-to-day operations . . . ."); *see also Freytag v. Comm'r of Internal Revenue,* 501 U.S. 868, 916 (1991) (Scalia, J., concurring in part) ("independent regulatory agencies" are "specifically designed *not* to have the quality . . . of being subject to the exercise of political oversight and sharing the President's accountability to the people") (internal quotation marks and alteration omitted); *Mistretta v. United States,* 488 U.S. 361, 411 (1989) (statutory provisions restricting presidential removal of agency heads are "specifically crafted to prevent the President from exercising 'coercive influence' over independent agencies").[1]

*Humphrey's Executor* is perhaps best explained by the fact that it was decided in 1935 on what became known as Roosevelt's "Black Monday." It was one in a line of

---

[1] The question of presidential control over agencies is distinct from the question of the executive power vis-à-vis congressional power: "The unitary executive theory merely means that truly executive power is concentrated in the President; the theory alone does not specify what counts as executive power in the first place." Neal Kumar Katyal, Hamdan v. Rumsfeld*: The Legal Academy Goes to Practice*, 120 HARV. L. REV. 65, 69 n.16 (2006). For example, one could believe, as Chief Justice Taft and President Roosevelt did, that the President must have the authority to control subordinate officers in the Executive Branch and at the same time could believe that the War Powers Resolution, which limits the President's power to wage war without congressional approval, is constitutional.

decisions issued in 1935 and 1936 – including two others on the same day as *Humphrey's Executor* – by a Supreme Court seemingly bent on resisting President Roosevelt and his New Deal policies. *See* Geoffrey P. Miller, *Independent Agencies*, 1986 SUP. CT. REV. 41, 93 ("*Humphrey's Executor*, as commentators have noted, is one of the more egregious opinions to be found on pages of the United States Supreme Court Reports."). The other cases in that line have long since been discarded as relics of an overly activist anti-New Deal Supreme Court. *See Yakus v. United States*, 321 U.S. 414 (1944) (backing away from prior opinions that had expanded non-delegation doctrine); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) (backing away from prior cases that had narrowly interpreted Commerce Clause); *see also West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937) (backing away from prior decisions that had aggressively used substantive due process doctrine to overturn state legislation).

But *Humphrey's Executor* survived. And it lives on.

II

Because of *Humphrey's Executor*, the President cannot remove an independent agency's officers when the agency pursues policies or makes decisions the President disagrees with. Because the power to remove is the power to control, the President lacks control over an independent agency – that is, the President lacks the power to direct or supervise an agency such as the Nuclear Regulatory Commission. To be sure, the President has power to cajole. The President also has the power to periodically appoint independent agency heads when the terms of old independent agency heads expire. But the President's power to cajole or to appoint – when not accompanied by the power to remove – is not the power to direct, supervise, or control, as a President or one who has worked for a President could readily explain. As the Supreme Court has stated: "Once an officer is appointed, it is only the

authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey." *Bowsher v. Synar,* 478 U.S. 714, 726 (1986); *see also* Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2308-09 (2001) ("When the independents were involved, [the President] acted not as the commander, but as a simple petitioner of the administrative state. Any other approach often would have proved futile (and therefore embarrassing): [The President], after all, had appointed only a subset of the commissioners, could remove none of them, and lacked any claim recognized in either the legal or the political sphere to their submission.").

Because of *Humphrey's Executor*, the President to this day lacks day-to-day control over large swaths of regulatory policy and enforcement in the Executive Branch – from communications regulation (the FCC) to labor regulation (the NLRB) to securities regulation (the SEC) to nuclear power regulation (the Nuclear Regulatory Commission). Those and many other independent agencies have huge policymaking and enforcement authority and greatly affect the lives and liberties of the American people. Yet those independent agencies are democratically unaccountable – neither elected by the people nor supervised in their day-to-day activities by the elected President.[2]

---

[2] One theory behind making agencies such as the Nuclear Regulatory Commission independent instead of executive was that independent agencies would make only "expert" scientific decisions and that such expert decisions should be made in an apolitical way. But those independent agencies also have to make a slew of non-scientific legal and policy judgments – such as how to interpret governing statutes, how to exercise policy discretion under those statutes, and whom to charge for violations of the law. Those legal and policy decisions generally cannot be resolved simply by scientific formula. Moreover, executive agencies such as EPA and FDA often have to make the same kinds of expert scientific decisions as independent agencies, yet those agencies have not been

This case is a good example of the continuing significance of *Humphrey's Executor* and the independent agency structure it endorsed. Interpreting the relevant nuclear waste statutes, the President of the United States has decided not to use Yucca Mountain as a repository for nuclear waste. As a candidate, the President campaigned on this issue. *See, e.g.*, Scott Conroy, *Obama's Nevada Ad Hits McCain on Yucca Mountain¸* CBS NEWS (Aug. 9, 2008). And as President, he has followed through on that commitment. *See e.g.*, DEPARTMENT OF ENERGY, FY 2011 CONGRESSIONAL BUDGET REQUEST, BUDGET HIGHLIGHTS 8 (Feb. 2010) (J.A. 688-89) ("The Administration has determined that developing a repository at Yucca Mountain, Nevada, is not a workable option and has decided to terminate" work on the Yucca Mountain project); Statement of Carol Browner, Director of White House Office of Energy and Climate Change Policy, at News Conference Announcing Blue Ribbon Commission on America's Nuclear Future (Jan. 29, 2010) (J.A. Addendum 177) ("As the President has said many times, we're done with Yucca . . . . [W]e work for the President, we take our

---

made independent. An agency's status as an executive agency does not preclude it from developing and operating with customary independence, such as the Attorney General and Solicitor General possess with respect to many decisions. But the President remains accountable for those officers' decisions. And the President has the legal authority to make the final decisions. There is no doubt, for example, that the Attorney General reports to the President, not the President to the Attorney General. Last Term in *Free Enterprise*, the Supreme Court noted: "One can have a government that functions without being ruled by functionaries, and a government that benefits from expertise without being ruled by experts. Our Constitution was adopted to enable the people to govern themselves, through their elected leaders." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3156 (2010).

directions from the President, the President has been clear that Yucca Mountain was not an option.").

Whether the President's Yucca Mountain decision, as implemented by his subordinates in the Department of Energy, is in fact consistent with federal statutory law is a hotly disputed question. If it is not consistent with the statutory law, the courts could so rule in an appropriate case. *Cf., e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). But that's not the question at issue here because the President turns out *not* to have the final word in the Executive Branch on that issue. He is powerless to direct or supervise the Nuclear Regulatory Commission, which is the independent agency charged with determining whether the Executive Branch may terminate the Yucca project. If the Commission rejects the President's policy decision and legal interpretation – by rejecting the pending application by the Department of Energy (the President's subordinate) to withdraw the licensing application for Yucca Mountain – then the President may be forced to continue with the Yucca Mountain project simply because the Nuclear Regulatory Commission has told him so.[3]

In its recent *Free Enterprise* decision, the Supreme Court recognized the constitutional and practical issues that continue to result from the *Humphrey's Executor* structure. *Free Enterprise Fund v. Public Co. Accounting Oversight*

---

[3] The oddity of the situation is apparent in the Government's brief in this case. The Department of Justice filed a single brief for the Department of Energy and the Nuclear Regulatory Commission. But the brief includes chestnuts such as this: "Because the Commission has not reached a decision on the motion to withdraw [the Yucca Mountain license application], NRC does not join the merits-based arguments set forth in this brief on behalf of DOE . . . ." Gov't Br. at 7.

*Bd.*, 130 S. Ct. 3138, 3155-59 (2010); *see also FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1816-17 (2009); *id.* at 1825-26 (Stevens, J., dissenting); *id.* at 1829-30 (Breyer, J., dissenting). In *Free Enterprise*, the Supreme Court drew an important constitutional line by refusing to extend *Humphrey's Executor* so far as to allow two levels of for-cause removal – an independent agency appointed by another independent agency. *See Free Enterprise*, 130 S. Ct. 3138.[4]

In so doing, the *Free Enterprise* Court repeatedly emphasized the central role of the President under Article II and the importance of that role to a government that remains accountable to the people. The Court's rhetoric and reasoning are notably in tension with *Humphrey's Executor* – and, indeed, in tension with the Nuclear Regulatory Commission's having the final word in the Executive Branch on this Yucca Mountain issue:

- "Article II confers on the President the general administrative control of those executing the laws. It is *his* responsibility to take care that the laws be faithfully executed. The buck stops with the President, in Harry Truman's famous phrase. As we explained in *Myers*, the President therefore must have some power of removing those for whom he can not

---

[4] In this case, the issue created by *Humphrey's Executor* is that the President's decision on the Yucca Mountain issue is not the final word in the Executive Branch. In other cases, the issue created by *Humphrey's Executor* is that it allows Presidents to avoid making important decisions or to avoid taking responsibility for decisions made by independent agencies. When independent agencies make such important decisions, no elected official can be held accountable and the people "cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Free Enterprise*, 130 S. Ct. at 3155 (quoting THE FEDERALIST NO. 70 (Hamilton)).

continue to be responsible." 130 S. Ct. at 3152 (internal quotation marks and citation omitted).

- "The people do not vote for the Officers of the United States. They instead look to the President to guide the assistants or deputies subject to his superintendence. Without a clear and effective chain of command, the public cannot determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall. That is why the Framers sought to ensure that those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." *Id.* at 3155 (internal quotation marks, citations, and alteration omitted).

- Granting an agency "executive power without the Executive's oversight . . . subverts the President's ability to ensure that the laws are faithfully executed – as well as the public's ability to pass judgment on his efforts." That result is "incompatible with the Constitution's separation of powers." *Id.*

- "No one doubts Congress's power to create a vast and varied federal bureaucracy. But where, in all this, is the role for oversight by an elected President? The Constitution requires that a President chosen by the entire Nation oversee the execution of the laws." *Id.* at 3155-56.

- "One can have a government that functions without being ruled by functionaries, and a government that benefits from expertise without being ruled by experts.

Our Constitution was adopted to enable the people to govern themselves, through their elected leaders. The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may slip from the Executive's control, and thus from that of the people." *Id.* at 3156.

• "[T]he dissent dismisses the importance of removal as a tool of supervision, concluding that the President's power to get something done more often depends on who controls the agency's budget requests and funding, the relationships between one agency or department and another, purely political factors (including Congress' ability to assert influence), and indeed whether particular *unelected* officials support or resist the President's policies. The Framers did not rest our liberties on such bureaucratic minutiae." *Id.* at 3156 (internal quotation marks, citation, and alteration omitted).

• "The Framers created a structure in which a dependence on the people would be the primary control on the government. That dependence is maintained, not just by parchment barriers, but by letting ambition counteract ambition, giving each branch the necessary constitutional means, and personal motives, to resist encroachments of the others. A key constitutional means vested in the President – perhaps *the* key means – was the power of appointing, overseeing, and controlling those who execute the laws." *Id.* at 3157 (internal quotation marks, citations, and alterations omitted).

• "The President has been given the power to oversee executive officers; he is not limited, as in Harry

Truman's lament, to persuading his unelected subordinates to do what they ought to do without persuasion. In its pursuit of a workable government, Congress cannot reduce the Chief Magistrate to a cajoler-in-chief." *Id.* (internal quotation marks, citation, and alteration omitted).

- Even "[b]road power" over an independent agency's functions – for example, with respect to approving the agency's budget – "is not equivalent to the power to remove" agency heads. "[A]ltering the budget or powers of an agency as a whole is a problematic way to control an inferior officer. The [supervisor] cannot wield a free hand to supervise individual [officers] if it must destroy the [agency] in order to fix it." *Id.* at 3158-59.

- "The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so. That power includes, as a general matter, the authority to remove those who assist him in carrying out his duties. Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else. Such diffusion of authority would greatly diminish the intended and necessary responsibility of the chief magistrate himself." *Id.* at 3164 (internal quotation marks and citation omitted).

The Court's various statements in *Free Enterprise* may be of great significance – as Justice Breyer seemed to suggest in issuing a strongly worded dissent in *Free Enterprise* and in reading it at length from the bench. To be sure, the *Free Enterprise* Court said that it was not reconsidering *Humphrey's Executor* because the double for-cause removal

question presented in *Free Enterprise* was "far more modest." *Id.* at 3157. But there can be little doubt that the *Free Enterprise* Court's wording and reasoning are in tension with *Humphrey's Executor* and are more in line with Chief Justice Taft's majority opinion in *Myers*.[5]

In addition to *Free Enterprise*, another recent development has prompted greater attention to the *Humphrey's Executor* independent agency structure: the uneven effectiveness of some of those agencies. For example, the financial crisis of 2008 obviously caused widespread hardship, and some say that several independent agencies were in part responsible for the collapse. When one presidential candidate in 2008 contended in the midst of the crisis that the President should fire the chairman of the SEC, many responded – with apparent justification, given

---

[5] Importantly, as *Free Enterprise* itself illustrated, *Humphrey's Executor* is not necessary to the *existence* of any particular agency. Rather, *Humphrey's Executor* affects only the accountability of the agencies and the control the President exercises over them. As *Free Enterprise* ruled, therefore, the remedy for holding an independent agency unconstitutional under Article II is *not* to abolish the agency. *See* 130 S. Ct. at 3161-62. Rather, the remedy is simply to ensure that the agency is more accountable to the people by giving the elected and accountable President greater control over the agency (by making the heads of agencies removable at will, not for cause). Similarly, if President Roosevelt had prevailed in the *Humphrey's* case itself, the Federal Trade Commission would not have disappeared. Rather, the agency simply would have become accountable to the President and thus to the people. Although *Humphrey's Executor* is sometimes criticized by those who oppose the size and scope of the modern administrative state, the case is a mistaken target for that criticism. *Humphrey's Executor* does not affect the size and scope of the administrative state. Rather, *Humphrey's Executor* affects the democratic accountability (or lack thereof) of the independent agencies within the administrative state.

*Humphrey's Executor* – that the President had no such power under current law. *See, e.g.*, Jeff Mason, *McCain Says He Would Fire Republican SEC Chief Cox*, REUTERS (Sept. 18, 2008). As that episode showed, in the *Humphrey's Executor*-style Executive Branch, the buck doesn't always stop with the President. *Cf.* THE FEDERALIST NO. 70 (Hamilton) ("A feeble executive implies a feeble execution of the government. A feeble execution is but another phrase for a bad execution; and a government ill executed, whatever it may be in theory, must be, in practice, a bad government.").

III

All of that said, *Humphrey's Executor* is an entrenched Supreme Court precedent, protected by stare decisis. The point of explaining its history and continuing repercussions here is not to suggest that the case should be overturned. But the fact that courts do and must accept the *Humphrey's Executor* precedent does not require ignoring the issues of accountability, liberty, and government effectiveness raised by independent agencies.

Various proposals have been advanced to enhance the accountability and effectiveness of independent agencies in a manner consistent with *Humphrey's Executor*.

For example, writing for four justices, Justice Breyer recently suggested that judicial review under the Administrative Procedure Act's arbitrary and capricious standard perhaps should be more intensive when courts review actions of independent agencies. Justice Breyer noted that the independent agency's "comparative freedom from ballot-box control makes it all the more important that courts review its decisionmaking to assure compliance with applicable provisions of the law – including law requiring that major policy decisions be based upon articulable reasons." *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1829-

30 (2009) (Breyer, J., dissenting). Justice Scalia, writing for four Justices, disagreed with that suggestion, arguing that there was "no reason to magnify the separation-of-powers dilemma posed by the Headless Fourth Branch by letting Article III judges – like jackals stealing the lion's kill – expropriate some of the power that Congress has wrested from the unitary Executive." *Id.* at 1817 (citation omitted). Of course, Justice Scalia has previously expressed severe criticism of *Humphrey's Executor*. *See Morrison v. Olson*, 487 U.S. 654, 725-27 (1988) (Scalia, J., dissenting). So his point in *Fox* seemed to be that he would prefer overruling *Humphrey's Executor* to the half-a-loaf approach articulated by Justice Breyer.[6]

Others have suggested, given the Article II backdrop, that an agency may be considered independent rather than executive only if Congress has expressly said as much, by placing for-cause limits on removal of the agency head. Indeed, Justice Breyer raised this issue in the *Free Enterprise* case. *See* Transcript of Oral Argument at 18, *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010) (No. 08-861) ("The SEC. What . . . restrictions? Because, interestingly enough, my law clerks have been unable to find any statutory provision that says that the President of the United States can remove an SEC commissioner only for cause. . . . It's silent."); *see also Free Enterprise*, 130 S. Ct. at 3182-84 (Breyer, J., dissenting). For example, the FCC and the SEC were created in the interim between *Myers* and *Humphrey's Executor* (that is, between 1926 and 1935), and Congress did not include for-cause removal provisions in their governing statutes, no doubt because such provisions were thought to be unconstitutional after *Myers*. In the wake of *Humphrey's Executor*, it nonetheless became customary to treat multi-member commissions created without for-cause removal provisions in

---

[6] Justice Kennedy did not take a position on this issue in *Fox*.

the interim between *Myers* and *Humphrey's Executor* as if they were independent. But Congress never went back and actually made the SEC and FCC Commissioners removable only for cause.[7]

Moreover, as President Roosevelt suggested in the wake of *Humphrey's Executor* itself, Congress and the President remain free to craft legislation that would increase the accountability of these agencies by making the agency heads removable at will – accompanied, if Congress chooses, by more tightly drawn substantive statutes so as to prevent excessive delegations of power to the Executive Branch or perceived concentration of power in the President. *Humphrey's Executor* holds only that independent agencies are constitutionally *permissible*, not that such agencies are constitutionally *required*. The political branches have their own authority and responsibility to interpret the Constitution in a situation like this and, in any event, are able as a policy matter to ensure that agencies are accountable to the people and run efficiently and effectively. *Cf.* Presidential Memorandum on Government Reform for Competitiveness and Innovation, 76 Fed. Reg. 14,273 (Mar. 11, 2011); THE PRESIDENT'S COMMITTEE ON ADMINISTRATIVE MANAGEMENT ("the Brownlow Committee"), REPORT OF THE COMMITTEE

---

[7] There is one post-*Humphrey's* case in which the Court suggested that there could be such a thing as an implied independent agency. *See Wiener v. United States*, 357 U.S. 349, 353-56 (1958). Assistant Attorney General Dellinger for the Office of Legal Counsel later opined that the "rationale of *Wiener*, which is essentially that *Congress* must have implied a for-cause removal restriction when *the Court* believes that the functions of the agency demand such tenure protection, seems questionable." *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. Off. Legal Counsel 124, 168 n.115 (1996) (citation omitted). Whether *Wiener* applies to the SEC and FCC, for example, is a question that would need to be confronted if Justice Breyer's inquiry were further pursued.

WITH STUDIES OF ADMINISTRATIVE MANAGEMENT IN THE
FEDERAL GOVERNMENT (1937).

\* \* \*

I end where I began.  This case is a dramatic illustration
of the continuing significance and implications of
*Humphrey's Executor*.  As a result of *Humphrey's Executor*
and the current statutory scheme, the President does not have
the final word in the Executive Branch about whether to
terminate the Yucca Mountain project.  For now, therefore,
the ball in this case rests in the Executive Branch not with the
President, but rather with the Nuclear Regulatory
Commission.